**Affirmed and Memorandum Opinion filed April 9, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00989-CV

---

**ROBERTO HINOJOSA, Appellant**

**V.**

**BRITTANY HINOJOSA, Appellee**

---

**On Appeal from the County Court No. 3**
**Galveston County, Texas**
**Trial Court Cause No. 10-FD-3116**

---

## MEMORANDUM OPINION

Appellant, Roberto Hinojosa ("Roberto"), appeals the portions of a final order affecting the parent-child relationship in which the trial court (1) appointed Roberto and Brittany Hinojosa ("Brittany") as joint managing conservators of the parties' two minor children, (2) issued a standard possession order governing Brittany's visitation rights, (3) excused Brittany from paying child support for any

month in which she traveled to exercise her visitation rights, and (4) refused to award retroactive child support. We affirm.

## I. BACKGROUND

Roberto and Brittany married in early 2003. Their daughter, V.H., was born in May 2002 when Brittany was sixteen years old. Their son, R.H., was born in December 2003. The couple separated in mid-2004.

The couples' relationship involved episodes of violence, although the evidence was disputed regarding which party, if not both, was the aggressor. Roberto acknowledged there were physical "altercations," including several occasions on which the police ordered him to leave the couple's home, but Roberto indicated these incidents were "normal things" associated with a marriage and both parties were responsible at times. Roberto described a specific occasion on which Brittany struck him because she did not approve of the television program he was watching. Brittany disputed this latter incident and characterized Roberto as committing "very much violence" in the marriage, including occasions on which he struck her, pushed her into a wall, tore her clothes, waved a gun near her, and intentionally damaged her car. Brittany further described the following incident after their separation: the police "escorted" Roberto away from Brittany; when he was released from jail in the middle of the night, he immediately went to her parents' home while she was present; and after this incident, Brittany requested a protective order because she feared Roberto. The trial record does not establish a protective order was actually entered, although Roberto acknowledged he went to court and the judge ordered certain periods in which he could visit the children.

Initially, the children lived with Brittany in the Houston area after the separation. Roberto has lived with his family in Bacliff, Texas since the

separation. In August 2004, Brittany took R.H. to live with Roberto's family while Roberto was working in Louisiana. According to Brittany, she was unable to care for R.H., who was born prematurely and has a history of medical issues; thus, she sought assistance from Roberto's parents but regularly visited the child until November 2004, when Roberto also took possession of V.H. Brittany testified that Roberto refused to return V.H. after Brittany permitted an overnight visit at Roberto's home; he told Brittany she could not see the children and they did not love her; over the next year, Brittany tried to visit the children every other month and phone them, but Roberto and his family precluded such contact; she was "cut off" from both children; and she could not afford legal assistance at that time. In contrast, Roberto suggested that Brittany attempted to visit the children only twice and he did not preclude such contact until November 2005.

At that time, Brittany was charged with several criminal offenses arising out of an incident at Roberto's home. Brittany ultimately pleaded guilty to deadly conduct by "waiving a firearm in the direction of Roberto," and a protective order was rendered precluding her from approaching within 200 yards of Roberto or the children at their daycare. The evidence at trial regarding this incident was scant. Roberto generally testified that Brittany appeared at his home while under the influence of alcohol or marijuana. Brittany suggested she went to the home because it was Thanksgiving and she missed the children but she did not have a gun. Brittany also pleaded guilty to possession of marijuana, which, at trial of the present case, she admitted was in her car.

Brittany testified that, when she was released from jail in February 2006, she went to live with her parents in Kentucky to get a "fresh start" and "get away from" Roberto. Brittany testified she did not tell Roberto where she was moving because she thought the protective order precluded such contact. It is undisputed

that Brittany did not see or attempt to contact the children between her move to Kentucky and some point in 2011 (after this proceeding began). Brittany did not provide any financial support during the period but testified that Roberto never asked her for support.

In 2010, Brittany filed for divorce in Kentucky, and Roberto filed the underlying petition for divorce in Texas. Roberto requested that he be appointed sole managing conservator of the children, Brittany be appointed a possessory conservator with supervised visitation, and Brittany be ordered to pay current and retroactive child support. In July 2011, the trial court conducted a bench trial.

On August 30, 2011, the trial court signed its final order. The Kentucky court had already dissolved the marriage, so the trial court made the following rulings, pertinent to this appeal, on issues concerning the children: (1) appointed the parties joint managing conservators with Roberto having the exclusive right to designate the children's primary residence in Galveston or contiguous counties; (2) issued a standard possession order governing Brittany's visitation rights; (3) ordered Brittany to pay child support of $295 per month until the first child reached majority status and $229 per month thereafter, but excused Brittany from paying child support for any month in which she travels from Kentucky to exercise her visitation rights; and (4) refused to award retroactive child support. Pursuant to Roberto's request, the trial court issued written findings of fact and conclusions of law, followed by additional findings and conclusions. Roberto filed this appeal of the order.[1]

---

[1] Subsequently, Roberto filed motions in the trial court and our court to suspend enforcement of the order during pendency of the appeal when Brittany expressed intent to exercise her visitation rights. Brittany requested sanctions on the ground that Roberto misrepresented to Brittany that our court had actually granted the motion, and thus Roberto denied unsupervised access, when we had merely abated instead for the trial court to consider the

## II. ANALYSIS

### A. Joint Managing Conservators

In his first issue, Roberto contends the trial court abused its discretion by designating the parties as joint managing conservators. We review a trial court's decision regarding conservatorship under the abuse-of-discretion standard and may reverse only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Under the abuse-of-discretion standard, legal and factual sufficiency of the evidence are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion. *In re T.J.L.*, 97 S.W.3d 257, 266 (Tex. App.—Houston [14th Dist.] 2002, no pet.). There is no abuse of discretion as long as some evidence of a substantive and probative character supports the trial court's decision. *Id.*

"The best interest of the child shall always be the primary consideration of the court in determining issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002 (West 2008). "It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child. A finding of a history of family violence involving the parents of a child removes the presumption under this subsection." *Id.* § 153.131(b) (West 2008). Family Code section 153.004 prescribes certain requirements for consideration of "History of Domestic

motion. After a hearing, the trial court sanctioned Roberto and his counsel based on the ground raised by Brittany and on the ground that his motion to suspend was frivolous; the court orally remarked that it had already ruled in the custody order on the issues raised in the motion to suspend and Roberto had not filed a motion to modify. Roberto does not appeal denial of the motion to suspend or the sanctions. However, the trial court made additional findings of fact and conclusions of law which are pertinent to those rulings and the custody order; thus, we include the latter findings in our discussion when applicable to disposition of the challenged portions of the custody order.

Violence" in conservatorship and possession decisions. *Id.* § 153.004 (West 2008). Roberto relies on section 153.004(b), which provides that "[t]he court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent, a spouse, or a child . . . ." *Id.* § 153.004(b). Roberto argues that he presented credible evidence that Brittany has a history or pattern of physical abuse directed against Roberto and neglect of the children.[2]

### 1. Allegation of Physical Abuse

To support his contention that Brittany has a history or pattern of physical abuse directed against Roberto, he cites the testimony of both parties as allegedly showing that they "hit each other and destroyed each other's property on a number of occasions." However, the trial court was free to disbelieve Roberto's account of the parties' "altercations" as involving mutual physical abuse by the parties and believe Brittany's testimony indicating Roberto was the aggressor and physically abusive toward Brittany. Indeed, the trial court made a finding that Roberto is "guilty of cruel treatment toward [Brittany] of a nature that renders further living together insupportable," which is supported by the evidence. *See In re C.Y.C.*, No. 14-11-00341-CV, 2012 WL 3223674, at *7 (Tex. App.—Houston [14th Dist.] Aug. 9, 2012, pet. denied) (mem. op.) (recognizing that trial court, as sole

---

[2] Roberto does not cite, and we have not found, any portion of the record demonstrating Roberto requested application of section 153.004(b) in the trial court, although he generally pleaded that appointment of both parties as joint managing conservators was not in the children's best interest. Further, Roberto did not obtain a finding of fact relative to section 153.004(b), although the trial court made a general finding that appointment of both parents as joint managing conservators was in the children's best interest. Even if we construe Roberto's pleading as implicitly requesting application of section 153.004(b), as a sub-issue of his allegation regarding joint managing conservators, and the trial court's best-interest finding as implicitly rejecting application of that provision, the trial court did not abuse its discretion.

judge of weight and credibility of the evidence, is not required to exclude parent as joint managing conservator pursuant to section 153.004(b) when evidence is conflicting on whether parent has history or pattern of physical abuse).

Roberto also relies on the incident in November 2005 which resulted in Brittany's guilty plea for deadly conduct and entry of the protective order. The record is not well-developed regarding the incident; there may have been strategic reasons that Brittany pleaded guilty to the charge even if she disputed the factual allegations, and she indicated she did not possess a gun during the incident.[3] Similarly, at the trial of the present case, Roberto did not present the protective order or any records showing the grounds for entry of the order or whether Brittany even defended against a request for a protective order. Further, because the protective order was rendered more than two years before the present proceeding was filed, the trial court was not compelled to consider it. *See* Tex. Fam. Code Ann. § 153.004(f) (providing court "shall consider whether a protective order was rendered . . . against the parent during the two-year period preceding the filing of the suit or during the pendency of the suit" when determining whether there is credible evidence of a history or pattern of abuse); *see also Stallworth v. Stallworth*, 201 S.W.3d 338, 347–48 (Tex. App.—Dallas 2006, no pet.).

Even if Brittany's guilty plea and/or entry of the protective order is evidence of "physical abuse" on that occasion, Roberto does not cite any authority holding that one such incident constitutes a "history" or "pattern" of abuse as a matter of law. In fact, Roberto acknowledges in his appellate brief that section 153.004

---

[3] In his brief, Roberto cites his post-trial affidavit attached to his motion to suspend enforcement of the custody order, in which he averred to additional facts regarding the incident. Because this affidavit or similar testimony was not part of the trial record relative to entry of the custody order, the order challenged on appeal, we will not consider the affidavit in reviewing whether the trial court abused its discretion by finding section 153.004(b) is inapplicable.

"does not define 'history' or 'pattern,' so courts use a factual analysis, considering both the number and kinds of acts involved when determining whether an appointment of JMC is barred." *See* Tex. Fam. Code Ann. § 153.004; *Alexander v. Rogers*, 247 S.W.3d 757, 762–64 (Tex. App.—Dallas 2008, no pet.) (recognizing that one incident may constitute a "history" of abuse, but fact finder may also decide one incident is not a "history" of abuse based on the circumstances, including amount of time that has passed since the incident; and even when protective order was rendered within two years before suit was filed, court must consider the order but it is not dispositive on issue of conservatorship); *Lowth v. Lowth*, No. 14-03-00061-CV, 2003 WL 22996939, at *6 (Tex. App.—Houston [14th Dist.] Dec. 23, 2003, pet. denied) (mem. op.) (holding trial court did not abuse its discretion by finding that incident of father "looming" over mother in a "threatening" manner and three incidents in which he pushed or threatened her, even if true, did not constitute credible evidence of "history" or "pattern" of abuse sufficient to rebut presumption they should be joint managing conservators); *Danklefs v. Danklefs*, No. 04-01-00849-CV, 2003 WL 21796380, at *2 (Tex. App.—San Antonio Aug. 6, 2003, pet. denied) (mem. op.) ("Excluding the interested parties' testimony, no evidence was presented that credibly indicated even one instance of physical abuse, much less a history or pattern.").

In the present case, the incident resulting in the deadly conduct plea occurred six years before trial. As discussed, above, there was no undisputed evidence of any other abusive behavior committed by Brittany against Roberto. Accordingly, the trial court did not abuse its discretion by determining that there was no credible evidence of a history or pattern of such physical abuse.

## 2. Allegation of Neglect

Roberto also contends that the evidence conclusively established that Brittany has a history of neglect of the children. Roberto cites the fact that Brittany did not notify Roberto when she moved to Kentucky, she did not thereafter see or attempt to contact the children for approximately six years, and she failed to provide any financial support during that period. Although the cold record shows these facts are undisputed, we will defer to the trial court's determination on whether there was a "history" of neglect for purposes of section 153.004(b) because it had the opportunity to observe the demeanor of both parents and evaluate their claims in light of all the evidence. *See Lowth*, 2003 WL 22996939, at \*4; *see also In re R.T.K.*, 324 S.W.3d 896, 901 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing "rather unique deference afforded a trial court's custody determinations, in light of its ability to sense 'the forces, powers, and influences that cannot be discerned by merely reading the record.'").

Specifically, Brittany's testimony supported the following conclusions: (1) Brittany moved away to Kentucky due, in whole or part, to the abusive relationship with Roberto; (2) Brittany was deterred from contacting the children by Roberto's previous conduct prohibiting such contact and her general fear of him; (3) Brittany, who was about twenty years old when she moved, lacked understanding regarding the terms of the protective order, to the extent it would not have precluded at least telephone contact or was not in effect for the entire six-year period; (4) Brittany lacked funds to pursue legal options until closer to the time of this proceeding; and (5) Roberto never requested any financial support. Indeed the trial court made a finding that "[Roberto's] cruel treatment was a factor in [Brittany] residing in Kentucky." Further, when asked why she was defending Roberto's suit, Brittany,

who is now raising another daughter (born in 2006 from a different relationship), replied:

> "I don't feel like I'm a bad mother at all. . . . I feel like much more responsible than I was at 18, 17, 16. I handle my daughter. I have responsibilities; and I'm very responsible. . . . Like, I didn't want to be away from my kids. That's what I want everybody to understand. I was restricted from seeing my kids.

Accordingly, the trial court acted within its discretion by concluding that there was no credible evidence that Brittany has a history of neglect of the children for purposes of section 153.004(b).

### 3. Allegation Regarding Son's Medical Needs

Roberto also contends that appointment of Brittany as a joint managing conservator is not in the children's best interest because undisputed evidence demonstrates she has never inquired about R.H.'s special nutritional, medical, and emotional needs. Roberto asserts that those needs are considerable because R.H. has physical disabilities, is unable to speak, and takes a daily regimen of prescription medications. Although Roberto includes this contention under his issue concerning 153.004(b), which focuses on a parent's past conduct, Roberto apparently complains not only about Brittany's alleged past neglect of R.H. but also about her alleged inability to care for him in the future.

However, the trial court acted within its discretion by finding that "No credible evidence was produced showing that appointment of [Brittany] as a managing conservator would 'significantly impair the children's physical health or emotional development.'" The trial court did hear evidence that R.H. has medical and emotional issues. Roberto testified that the child, who was seven-years-old at the time of trial, has had numerous surgeries, including three open heart surgeries, and has the mental capacity of a five-year-old. Roberto's testimony also indicates

10

that, at least as an infant, R.H. required a feeding tube. However, Roberto did not present evidence at trial describing R.H.'s specific current needs or that Brittany has not inquired about, and cannot adequately care for, any such needs. Roberto cites a portion of Brittany's testimony in which she stated that she did not understand R.H.'s medical needs. However, viewed in context, Brittany then stated that she did not understand the question and clarified that she knows R.H. has congenital heart disease and speech and learning disabilities.

We recognize the evidence regarding the circumstances under which Brittany relinquished R.H. to Roberto's parents in August 2004 (when he was eight months old) is relevant to Roberto's contention regarding Brittany's alleged inability to care for any special needs. According to Brittany, she was unable to care for R.H. and her parents were unavailable to help, so she sought assistance from Roberto's parents but regularly visited the child. In contrast, Roberto suggested that Brittany abandoned the child's needs at that time because he testified that (1) Brittany's stepfather "dropped off" R.H. at Roberto's family's home with only his carrier and no other baby items, and the family took the child to the emergency room because his required feeding pump was missing, (2) R.H. was then hospitalized for a month, and (3) Brittany never visited R.H. in the hospital although Roberto and the hospital informed her about the hospitalization. Brittany's testimony regarding her contact with the child while he was hospitalized was not exactly clear. At one point, she indicated she visited the child; but at another point, she disputed that Roberto or the hospital informed her about the hospitalization, making it unclear whether she failed to visit or did visit but learned of the hospitalization from another source.

Nonetheless, the trial court, having observed the parties' demeanors, could have believed Brittany's testimony, discounted Roberto's testimony, and found the

following: (1) it was Brittany who took the child to Roberto's family for assistance; (2) her actions negated neglect and showed instead that Brittany, who was eighteen-years-old at the time, appreciated she could not adequately care for the son's needs and relinquished him to persons who could provide that care; and (3) Brittany, who had matured during the seven years since she relinquished R.H. and cares for another child, would not neglect any current special needs that R.H. might have.

In summary, the trial court did not abuse its discretion by determining that appointment of the parents as joint managing conservators is in the children's best interest. We overrule Roberto's first issue.

## B. Standard Possession Order

In his second issue, Roberto contends the trial court abused its discretion by issuing a standard possession order instead of requiring supervised visitation because (1) Brittany has a history of family violence, neglect of the children, including failure to provide financial support, and drug or alcohol abuse, (2) there is no evidence she will provide the necessary medical care for R.H., (3) she has not bonded with the children, and (4) she admitted her visitation should be supervised.

There is a rebuttable presumption that the standard possession order "(1) provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator; and (2) is in the best interest of the child." Tex. Fam. Code Ann. § 153.252 (West 2008). However, a trial court is permitted to place conditions on a parent's access, such as supervised visitation, if necessary for the child's best interest, including protection of the child from the effects of a parent's drug use. *See id.* §§ 153.193, 153.256 (West 2008); *In re A.L.E.*, 279 S.W.3d 424, 431, 432 n.7 (Tex. App.—Houston [14th Dist.] 2009, no

12

pet.). There is also "a rebuttable presumption that it is not in the best interest of a child for a parent to have unsupervised visitation with the child if credible evidence is presented of a history or pattern of past or present child neglect or physical or sexual abuse by that parent directed against the other parent, a spouse, or a child." Tex. Fam. Code Ann. § 153.004(e).

We reject Roberto's contention that the trial court abused its discretion by issuing a standard possession order based on Brittany's alleged history of family violence or neglect, and the alleged inability to care for R.H.'s needs, for the same reasons the trial court did not abuse its discretion by appointing Brittany a joint managing conservator. Additionally, the trial court was free to believe Brittany's testimony that she no longer uses any illegal drugs when refusing Roberto's request for supervised access.

With respect to Roberto's argument regarding lack of a bond, Brittany has visited in person, and via Skype and telephone, with the children since the divorce proceeding began. Even Roberto acknowledged that this interaction has been "good," and he does not oppose a relationship between Brittany and the children, although he wants her visitation to be supervised until she proves that she can care for them and is committed to maintaining a relationship. Testimony regarding the visits focused more on V.H., as the child who would more likely remember Brittany; Brittany testified that V.H. "knew" her, and Roberto admitted V.H. was happy to see her mother and had not expressed fear of staying with her. Again, we defer to the trial court, who was in the best position to evaluate whether Brittany would nurture a bond with the children during unsupervised visitation, despite their long separation.

Finally, contrary to Roberto's contention, Brittany did not admit that "allowing her unsupervised visitation with the children at first would not be in their best interests, as she does not know them and needs to form a bond." Instead, Brittany acknowledged that supervised visitation would be acceptable to her and she understood the court might impose that proviso, but she did not admit that the visitation should definitely be supervised.

Accordingly, the trial court did not abuse its discretion by issuing a standard possession order. We overrule Roberto's second issue.

## C.     Excuse from Child Support Obligation for Travel Expenses

In his third issue, Roberto challenges the trial court's order that, "if [Brittany] travels from Kentucky to exercise her possession rights, then child support will not be owed to [Roberto] for the month that she exercised those rights." We review a child support order for abuse of discretion. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam).

In its findings of fact, the trial court made several findings relative to the ordered relief. First, the court computed the amount of child support under the Family Code guidelines as $298.11 per month. *See* Tex. Fam. Code Ann. § 154.125, .128, .129 (West 2008 & Supp. 2012). The court then found child support should be ordered in the amount of $295 per month. The court then listed the following as reasons that the ordered support varies from the amount computed under the support guidelines: the age and needs of the children; the ability of the parents to contribute to the support of the children; the financial resources available for the support of the children; the amount of time of possession of and access to the children; distance between the parties, and the costs of visitation by Brittany. *See id.* § 154.123 (West 2008) (permitting trial court to order child

14

support in amount other than that established by the guidelines if evidence rebuts presumption that application of the guidelines is in the best interest of the child and justifies a variance from the guidelines; and listing non-exclusive factors the trial court shall consider in "determining whether application of the guidelines would be unjust or inappropriate under the circumstances"). Finally, the court found, "[Brittany] shall be credited the costs of her travel expenses (up to $295 per month) to exercise her visitation periods."

Roberto does not argue that the trial court lacked discretion to deviate from the amount computed under the child support guidelines based on Brittany's costs of visitation. At trial, Brittany estimated that her costs to travel from Kentucky to Texas would exceed $700 per trip. Rather, Roberto suggests that the trial court performed an impermissible "double-dipping" by using Brittany's travel expenses to both (1) deviate from the guidelines when reducing the child support from $298.11 to $295 and (2) then offset the travel expenses against the $295. Assuming, without deciding, that Roberto preserved his complaint for appellate review, we disagree.

It is clear that the trial court meant for the "costs of visitation" reason for deviation to serve primarily as a justification for the travel-expenses credit rather than the reduction from $298.11 to $295—a de minimis rounding down of only $3.11. We construe the total monthly support obligation as comprised of both the initial reduction to $295 and the allowance of the credit, because both affect the total amount of child support due, even if the amount varies from month to month depending on whether Brittany travels to Texas. Thus, we construe the trial court's reasons for deviation from the computed amount as a permissible justification for the total obligation ordered, as opposed to an impermissible "double-dipping." We overrule Roberto's third issue.

15

**D.    Retroactive Child Support**

In his fourth issue, Roberto challenges the trial court's refusal to award retroactive child support. An award of retroactive support is not mandatory, and a trial court maintains discretion in deciding whether to award retroactive support. *Randolph v. Randolph*, No. 14-04-00180-CV; 2005 WL 2276873, at *1 (Tex. App.—Houston [14th Dist.] Sept. 20, 2005, no pet. (mem. op.); *see* Tex. Fam. Code Ann. § 154.009 (West 2008) (providing that the court "*may*" order a parent to pay retroactive child support under certain circumstances) (emphasis added); Tex. Fam. Code Ann. § 154.131(a) (West 2008) (stating "the child support guidelines are intended to guide the court in determining the amount of retroactive child support, *if any*, to be ordered") (emphasis added). Therefore, we review a trial court's denial of a request for retroactive child support under the abuse-of-discretion standard. *Randolph*, 2005 WL 2276873, at *1.

Section 154.131 includes the following provision:

(b)  In ordering retroactive child support, the court shall consider the net resources of the obligor during the relevant time period and whether:

(1)  the mother of the child had made any previous attempts to notify the obligor of his paternity or probable paternity;

(2)  the obligor had knowledge of his paternity or probable paternity;

(3)  the order of retroactive child support will impose an undue financial hardship on the obligor or the obligor's family; and

(4)  the obligor has provided actual support or other necessaries before the filing of the action.

Tex. Fam. Code Ann. § 154.131(b).

In its findings of fact, the trial court recited that it considered the following factors in denying Roberto's request for retroactive support: (a) Brittany's net

resources; (b) Roberto "had made little or no attempts to obtain child support during the separation period"; and (c) "an order of retroactive child support would impose an undue financial hardship" on Brittany and her family.

Roberto contends that factor (b) is not a permissible consideration under section 154.131(b). However, the considerations listed in section 154.131(b) are not exclusive factors. *See id.* (stating court "shall" consider the factors but not mandating they are the only applicable factors); *see also In re J.H.*, 264 S.W.3d 919, 924–25 (Tex. App.—Dallas 2008, no pet.) (citing *Garza v. Blanton*, 55 S.W.3d 708, 710 (Tex. App.—Corpus Christi 2001, no pet.)).

Roberto also argues that the trial court's denial of retroactive support based on Brittany's net resources and undue financial hardship is contrary to the evidence demonstrating Brittany maintained steady employment during the years before trial at an income justifying an award of retroactive support. At trial, Roberto presented Brittany's tax returns showing her annual adjusted gross income for those years (2007–2010) averaged from about $27,000 to $29,000. However, Brittany testified that she had been unemployed since March 2011 (for four months before trial) and presented evidence she was receiving net unemployment benefits of $1,306 per month (which equals $15,672 annually). Brittany presented evidence that she had been using some of the unemployment benefits to pay the temporary support ordered by the court (after this proceeding was filed), she was living with her parents and contributed to their household expenses, she was still paying medical expenses incurred for surgery undergone by both Brittany and her other daughter within the year before trial, Brittany received no child support for her other daughter, and Brittany's total monthly expenses were $1,390.

Roberto asserts that there was no evidence supporting the trial court's finding that retroactive support would place an undue financial burden on Brittany's family because she presented no evidence regarding their finances. However, by referring to Brittany's "family," the trial court could have meant Brittany's other daughter for whom she was still paying medical expenses and supporting in general.

We conclude the trial court did not abuse its discretion by denying Roberto's request for retroactive support. We overrule Roberto's fourth issue.

We affirm the trial court's final order.


/s/    Margaret Garner Mirabal
Senior Justice


Panel consists of Justices Boyce, McCally, and Mirabal.[4]

---

[4] Senior Justice Margaret Garner Mirabal sitting by assignment.